UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGEL RUBIO, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AARON'S LLC, a Georgia limited liability company; QUINTIN LAKE, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | No. 1:24-cv-00526-KES-BAM<br><br>ORDER GRANTING MOTION TO COMPEL ARBITRATION<br><br>Doc. 7 |

Defendant Aaron's LLC ("Aaron's") motion to compel arbitration and to stay action, filed on July 29, 2024 (Doc. 7), is before the Court. The motion is fully briefed. Doc. 13 ("Opp'n"), Doc. 14 ("Reply"). For the reasons discussed below, the Court grants the motion.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

Aaron's leases and sells furniture, electronics, appliances, and computers throughout the United States, including in California. Doc. 7-2, ¶ 3. Plaintiff Angel Rubio ("Rubio") worked for Aaron's as a non-exempt hourly employee from July 2023 until he filed this class action lawsuit. Doc. 1-1, ¶ 2; Doc. 13-1, ¶ 3.

A.  **Aaron's Onboarding Process and the Arbitration Agreement**

According to Aaron's Human Resources Onboarding Operations Manager Marsha Brown,

1

1  who oversees the onboarding process, Aaron's disseminates many of its employment agreements
2  and policies electronically to new employees.  Brown Decl. (Doc. 7-2 at 2) ¶¶ 2–4.  Aaron's uses
3  an electronic system to confirm and track when applicants or employees electronically
4  acknowledge its policies and procedures.  *Id.* ¶ 4.  Aaron's uses a system called Dayforce.  *Id.*
5  When applying for a position with Aaron's, a prospective employee must provide a personal
6  email address.  *Id.*  After Aaron's hires an applicant, Aaron's creates a username and initial
7  Dayforce password for the new hire and sends the new hire an email with this information along
8  with a link to a website.  *Id.* ¶ 5.  When the new hire clicks on the link, he or she is prompted to
9  enter the username and initial Dayforce password and then is prompted, and required, to create a
10 user-selected password.  *Id.*  New hires are not otherwise able to access the Dayforce system from
11 this website; they can access the Dayforce system only in an Aaron's store from a store computer.
12 *Id.*  New hires are not able to log into Dayforce at the store until they have created a user-selected
13 password using the process described above.  *Id.*  Aaron's employees are prohibited from sharing
14 their account information and passwords or using the account information and passwords of other
15 employees.  *Id.* ¶ 6 & Ex. A (Doc. 7-2 at 8–17).

16    New hires log into Dayforce from a store computer using their unique username and
17 password.  Once in the Dayforce system, the employee clicks a link stating, "Getting Started."  *Id.*
18 ¶ 8 & Ex. B.  The link opens a page with several tab headings, including a tab entitled "Your
19 Onboarding Forms."  *Id.* ¶ 8 & Ex. C.  The employee clicks that tab to complete all the necessary
20 forms associated with starting the position.  *Id.* ¶ 8.  The onboarding forms include several boxes,
21 each stating "Please click here to complete your [Onboarding Form]."  *Id.* ¶ 9 & Ex. D.  The
22 employee must scroll down to review and complete each onboarding form listed on the page.  *Id.*
23 ¶ 9.  One of these forms is the Arbitration Agreement Acknowledgment.  *Id.*

24    The Arbitration Agreement Acknowledgment page says, "Please read and acknowledge
25 with your esignature," followed by a box that states "Start."  Ex. E.  Once the employee clicks the
26 box, a new page appears with text stating:

27    By providing my e-signature below, I acknowledge that I have read,
      and that I knowingly and voluntarily sign, Aaron's Agreement to
28    Arbitrate ("Arbitration Agreement" or "Agreement.").  I understand

> that this Arbitration Agreement has already been agreed to by Aaron's, Inc. I further understand that if I do not wish to be subject to the terms of the Arbitration Agreement, I must opt out by notifying the Company in writing, using the Company's designated opt out form (i.e., the Aaron's Arbitration Agreement Election Form) accessible through the above Aaron's Arbitration Agreement link, within thirty (30) days of the date on which the Company published this agreement to me electronically.

Brown Decl. ¶ 10 & Ex. F. As noted, new hires may opt out of the arbitration agreement within 30 days of receiving the agreement. *See also id.* ¶ 16 & Exs. F, H, J, L.

Below this text, there is a link to a PDF version of the agreement to arbitrate. *Id.* By clicking on the link, the employee can view the full agreement to arbitrate and download or print the agreement. *Id.* There is also a box to check to accept and acknowledge the agreement, a box for entering the date, and a link to start the signing process for the agreement. *Id.* ¶¶ 10–11 & Ex. F. When the employee checks the box to accept and acknowledge the agreement, a DocuSign window appears stating "Please read the Electronic Record and Signature Disclosure," and providing a link to the disclosure. *Id.* ¶ 11. Beneath this disclosure link, there is another box to check stating "I agree to use electronic records and signatures." *Id.* & Ex. G. After checking the box, the employee selects "Continue." *Id.*

The employee is next prompted to "start" the signing process for the arbitration agreement. *Id.* ¶ 12 & Ex. H. Once the employee clicks "start," another window entitled "Adopt Your Signature" appears, which contains a box auto populated with a cursive version of the employee's name and initials. *Id.* ¶ 12 & Ex. I. The employee can also draw or upload his or her own signature. *Id.* Underneath the example signature are buttons labeled "Adopt and Sign" and "Cancel." *Id.* When the employee presses "Adopt and Sign," DocuSign applies the employee's signature. *Id.* ¶ 13 & Ex. J. A button labeled "Finish" appears, and when the employee presses "Finish," DocuSign applies a unique electronic "Envelope ID" to the transaction. *Id.* ¶ 14 & Ex. K. Dayforce saves copies of the employee's acknowledgment, including the DocuSign Envelope ID, to the Dayforce system. *Id.*

///

1  On July 5, 2023, Rubio electronically signed the Arbitration Agreement Acknowledgment. *Id.* ¶ 17 & Ex. M. He acknowledged that, by signing with his e-signature, he had read, and was knowingly and voluntarily signing, Aaron's arbitration agreement. *Id.* As noted above, the acknowledgement also included Rubio's agreement that, if he did not wish to be subject to the arbitration agreement, he was required to "opt out by notifying the Company in writing, using the Company's designated opt out form (i.e., the Aaron's Arbitration Agreement Election Form) accessible through the above Aaron's Arbitration Agreement link, within thirty (30) days . . . ." *Id.*

The arbitration agreement also contained information concerning the opt out provision in a separate bolded section, entitled "Right to Opt-Out," that provided:

> If you do not wish to be bound by the terms of this Agreement, you must opt out by notifying the Company in writing, using the Company's designated opt-out form. In order to opt out of the benefits of this Agreement, you must fully complete and submit the opt-out form within thirty (30) days of the date on which the Company published this Agreement to you electronically (the "Opt-Out Period").

*Id.* ¶ 16 & Ex. L (Doc. 7-2 at 43). The opt-out section provides a clickable link to access the opt-out form. *Id.* It further provides that "[t]o be effective, the opt-out form must be signed by you, dated, it must contain all of the requested information in legible print, and it must be postmarked and sent via traceable mail (e.g., trackable US Mail, FedEx, UPS, etc.) or delivered via hand delivery within the Opt-Out period." *Id.* The opt-out section also provides: "Should you timely opt out as provided in this paragraph, you will not be subject to any adverse employment action as a consequence of that decision and you may pursue available legal remedies without regard to this Agreement." *Id.* The arbitration agreement provides that an employee is bound by its terms unless the employee timely opts out of the agreement. *Id.* at Ex. L (Doc. 7-2 at 43). The agreement remained available on the Dayforce system for the employee to later review, download, or print at any time. *Id.* ¶ 17.

///

///

4

**B.**     **Procedural Background**

Rubio filed this action in the Fresno County Superior Court against defendants Aaron's, Quintin Lake, and Does 1 through 100 on February 23, 2024. *See* Doc. 1-1. Aaron's removed the action to this Court on May 2, 2024. Doc. 1. The complaint alleges various violations of the Labor Code and Business & Professions Code: failure to pay overtime wages (Claim One); failure to pay minimum wages (Claim Two); failure to provide meal periods (Claim Three); failure to provide rest periods (Claim Four); waiting time penalties (Claim Five); wage statement violations (Claim Six); failure to timely pay wages (Claim Seven); failure to indemnify (Claim Eight); failure to pay interest on deposits (Claim Nine); violation of Labor Code § 227.3 (Claim Ten); and unfair competition (Claim Eleven). Doc. 1-1, §§ 37–112. On July 29, 2024, Aaron's moved to compel arbitration and to stay the action pending the completion of arbitration. Doc. 7.[1]

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the enforcement of arbitration agreements. 9 U.S.C. § 2. "Section 2 of the statute makes arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1917 (2022) (quoting 9 U.S.C. § 2). "As [the Supreme Court has] interpreted it, this provision contains two clauses: An enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal law, and a saving clause, which permits invalidation of arbitration clauses on grounds applicable to 'any contract.'" *Id.* at 650 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339–340 (2011)).

A party seeking to enforce an arbitration agreement may petition the court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. In ruling on a motion to compel arbitration, a court's role is "limited to

---

[1] Aaron's also moves unopposed for judicial notice of the American Arbitration Association's Employment Arbitration Rules and Employment/Workplace Fee Schedule. *See* Doc. 7-4. Rubio does not challenge the authenticity of these documents. The Court takes judicial notice of these documents, which are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016). The party seeking to compel arbitration bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Parties may rely on contract law defenses to challenge an agreement to arbitrate. *See Concepcion*, 563 U.S. at 339. "To require arbitration, [a plaintiff's] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985)). If a valid arbitration agreement encompassing the dispute exists, arbitration is mandatory. *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Under section 3 of the FAA, a court, "upon being satisfied that the issue involved . . . is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

**III.   ANALYSIS**

Aaron's maintains that Rubio signed a valid agreement to arbitrate all disputes related to his employment, and that the agreement mandates individual arbitration and forecloses lawsuits by class action. Doc. 7-1 at 7. Rubio disputes that there is a valid arbitration agreement and further asserts that any arbitration agreement is unenforceable because it is procedurally and substantively unconscionable. Doc. 13 at 5–6.

    **A.**    <u>**Validity of the Arbitration Agreement**</u>

        1.    <u>Entry into the Arbitration Agreement</u>

The parties agree that California law governs the issue of the validity of the arbitration agreement. *See* Docs 7, 13. Rubio contends that Aaron's fails to adequately establish that the

6

parties entered into the arbitration agreement. Doc. 13 at 7.  He argues that Aaron's declarant, Marsha Brown, does not have personal knowledge of Rubio's alleged execution of the arbitration agreement.  *Id.* at 8.  Rubio asserts in his declaration that (1) he does not recall ever being presented with an arbitration agreement at the time of his hiring or at any other point; (2) he has no recollection of signing any agreement to arbitrate claims arising out of his employment with Aaron's; (3) no one ever informed him about an arbitration agreement, asked him to sign it, or explained what an arbitration agreement was; and (4) until his counsel explained it to him, he did not know what arbitration was.  Rubio Decl. (Doc. 13-1) ¶¶ 4–7.

Rubio's arguments concerning whether he entered into the arbitration agreement are unpersuasive.  Aaron's properly authenticated Rubio's electronic signature on the arbitration agreement and has shown by a preponderance of the evidence that Rubio entered into the agreement.  *See* Doc. 7-2.  To authenticate evidence a party must "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); *American Fed'n of Musicians of the U.S. v. Paramount Pictures Corp.*, 903 F.3d 968, 976 (9th Cir. 2018).  There are many methods of authenticating evidence under Federal Rule of Evidence 901(b), and the proponent's burden has been characterized as "not high."  *See Prostek v. Lincare Inc.*, 662 F. Supp. 3d 1100, 1111 (E.D. Cal. Mar. 21, 2023) (discussing authentication of arbitration agreement) (quotations and citations omitted).

Aaron's has established through Brown's declaration and its exhibits that Rubio signed the arbitration agreement along with other onboarding documentation and that the arbitration agreement contains Rubio's electronic signature, dated July 5, 2023.  *See* Doc. 7-2, Exs. M–N. Brown's declaration establishes her knowledge of the onboarding process, the documents included in that process, and the procedures by which new employees of Aaron's "complete, review, and acknowledge" those documents.  *Id.* ¶ 3.  She describes the onboarding process in detail, provides screenshots showing each step of the process, and provides the arbitration agreement that Rubio electronically signed.  *Id.* ¶ 17; Exs. M–N.  Brown's declaration sufficiently authenticates the signed arbitration agreement for purposes of Federal Rule of Evidence 901(a).

Rubio argues that he did not agree to the arbitration agreement because he "does not

1 recall" signing it.  Doc. 13 at 5.  Rubio's lack of recollection does not contradict the evidence that
2 he signed the agreement.  Nor does it establish a lack of mutual consent to the arbitration
3 agreement.  Under California law, a valid contract requires the "mutual consent of the parties,"
4 which is "generally achieved through the process of offer and acceptance."  *DeLeon v. Verizon*
5 *Wireless, LLC*, 143 Cal. Rptr. 3d 810, 821 (Cal. Ct. App. 2012) (internal citations omitted).  An
6 offeree "may be held to have accepted, by his conduct, whatever terms the offer contains" so long
7 as there was a sufficient "outward manifestation or expression of assent."  *Windsor Mills, Inc. v.*
8 *Collins & Aikman Corp.*, 101 Cal. Rptr. 347, 350 (Cal. Ct. App. 1972).  These principles apply to
9 all contracts, including arbitration agreements. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171,
10 1175 (9th Cir. 2014) (internal quotation marks omitted).  Whether there was mutual consent "is
11 determined under an objective standard applied to the outward manifestations or expressions of
12 the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed
13 intentions or understandings."  *Id.*

14 Brown's declaration and attached exhibits establish the steps that Rubio, as a new hire,
15 followed through the online onboarding process, including Rubio's specific acknowledgement of
16 and consent to the arbitration agreement.  In this process, the arbitration agreement was separately
17 identified, and Rubio separately entered his electronic signature agreeing to it.  The onboarding
18 steps also clearly identified the option, which Rubio did not exercise, to opt out of the arbitration
19 agreement.  Rubio does not provide any evidence to the contrary, stating only that he does not
20 recall signing the agreement.

21 Rubio relies on *Metter v. Uber Technologies, Inc.*, No. 16-cv-06652-RS, 2017 WL
22 1374579, * 4 (N.D. Cal. April 17, 2017) for the proposition that his lack of recollection of
23 entering into the arbitration agreement precludes a finding that the parties manifested an
24 agreement to arbitrate.  *Metter* is distinguishable from the present case.  In *Metter*, the plaintiff
25 provided a "credible and consistent" declaration establishing that a pop-up keypad on an
26 application physically obscured a critical alert intended to notify him of the terms of service.  *Id.*
27 at *4.  When the plaintiff in *Metter* completed the registration process through the pop-up keypad,
28 "the . . . app functionally prevented him from seeing the terms of service alert," and he registered

8

1  "without inquiry notice . . . of the terms of service and without understanding that registering is a
2  manifestation of assent to those terms." *Id.* at *3.

3  Unlike the plaintiff's specific allegations in *Metter*, Rubio fails to identify any reason why
4  he did not or could not have seen the arbitration agreement. He claims not to recall signing the
5  agreement, but he does not deny that he electronically signed it. In contrast, the plaintiff in
6  *Metter* established that he had not seen the arbitration agreement. The *Metter* decision
7  distinguished the plaintiff's situation in that case from other cases, like that of Rubio here, "where
8  [a] plaintiff conclusorily claimed he never saw the [arbitration agreement], but did not
9  affirmatively identify any particular reason he would not or could not have seen it." *Id.* at *4; *see
10 also Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. Jan. 5, 2017)
11 (finding plaintiff's conclusory allegations regarding lack of notice of terms and conditions
12 contradicted by evidence showing he assented to arbitration agreement).

13 Accordingly, Aaron's has established that Rubio entered into the arbitration agreement.

14  2. Unconscionability

15 Rubio contends that the arbitration agreement is unconscionable and should not be
16 enforced. "Under California law, 'the party opposing arbitration bears the burden of proving any
17 defense, such as unconscionability.'" *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1013 (9th Cir.
18 2023) (quoting *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223,
19 236 (2012)). If a contract or clause was unconscionable at the time it was made, a court may
20 refuse to enforce the contract, enforce the remainder of the contract without the unconscionable
21 clause, or limit the application of any unconscionable clause to avoid an unconscionable result.
22 Cal. Civ. Code § 1670.5(a). Unconscionability has both procedural and substantive elements,
23 "the former focusing on oppression or surprise due to unequal bargaining power, the latter on
24 overly harsh or one-sided results." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011)
25 (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000))
26 (internal quotation marks omitted).

27 Under California law, "unconscionability requires a substantial degree of unfairness
28 beyond a simple old-fashioned bad bargain." *Mohamed v. Uber Technologies, Inc.*, 848 F.3d

1201, 1210 (9th Cir. 2016) (cleaned up) (quoting *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244 (2016). Unconscionability "is concerned . . . with terms that are unreasonably favorable to the more powerful party." *Bielski*, 87 F.4th at 1013 (quoting *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015)). "[B]oth procedural and substantive unconscionability must be present in order for an agreement to be unenforceable." *Mohamed*, 848 F.3d at 1211 (citation omitted); *see also Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (en banc) (same). While both elements must be shown to establish the unconscionability defense, they need not be present in the same degree—they are weighed on a sliding scale, which allows a lesser finding of procedural unconscionability when there is significant substantive unconscionability present, and vice versa. *Armendariz*, 24 Cal. 4th at 114.

### a. Procedural Unconscionability

Rubio contends the arbitration agreement is procedurally unconscionable because it is a contract of adhesion that was presented to employees on a take it or leave it basis with no opportunity to negotiate the terms, he was not informed of any opt-out procedure and his failure to opt out was therefore not an exercise of his independent choice or judgment, and the agreement incorporated the American Arbitration Association's Employment Arbitration Rules and Mediation Procedures ("AAA Rules") only by reference. *See* Doc. 13. Aaron's disputes that the arbitration agreement is procedurally unconscionable, relying primarily on the agreement's opt-out provision. *See generally* Docs. 7, 14.

"The threshold inquiry in California's unconscionability analysis is 'whether the arbitration agreement is adhesive.'" *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006) (quoting *Armendariz*, 24 Cal. 4th at 113). A contract of adhesion is "a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms." *Id.* (citation omitted). "Arbitration contracts imposed as a condition of employment are typically adhesive." *OTO, LLC v. Kho*, 8 Cal. 5th 111, 126 (2019); *see also Armendariz*, 24 Cal. 4th at 115 ("[i]n the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few

employees are in a position to refuse a job because of an arbitration agreement").

However, as the Ninth Circuit has held, "an arbitration agreement is not adhesive if there is an opportunity to opt out of it." *Mohamed*, 848 F.3d at 1211 (citing *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199 (9th Cir. 2002)); *see also Kilgore*, 718 F.3d at 1059. In *Mohamed*, the Ninth Circuit reversed the district court's denial of Uber's motion to compel arbitration of a former Uber driver's claims, finding that Uber's arbitration agreements were not adhesive because the plaintiff had a meaningful opportunity to opt out of them, and that the challenged terms of the agreements were therefore not procedurally unconscionable. *Mohamed*, 848 F.3d at 1211. The agreements in *Mohamed*, as here, provided the plaintiff with the option to opt out of arbitration by delivering notice of an intent to opt out within 30 days of entering into the agreement. *Id.* The opt out provision in one of the Uber agreements required drivers to opt out either in person at Uber's San Francisco offices or by overnight delivery service. *Id.* at 1210–11. The Ninth Circuit held that this opt out procedure was not illusory. *Id.* at 1211. As the opt-out provisions in the Uber agreements provided a meaningful choice to Uber drivers, the Court concluded the agreements were neither adhesive nor procedurally unconscionable. *Id.* at 1211–12.

*Mohamed* controls the outcome in this case. As in *Mohamed*, Rubio was clearly notified of the option to opt out of Aaron's arbitration agreement and the 30-day window in which to do so. *See* Brown Decl. (Doc. 7-2), Exs. F, H, J, L. The opt out procedure mirrors the procedure upheld in *Mohamed*: Rubio was similarly required to deliver the opt out form to Aaron's by overnight mail or by hand delivery within 30 days. *Id.* ¶ 16 & Ex. L. Rubio did not elect to opt out. As in *Mohamed*, the arbitration agreement was not adhesive as it contained a meaningful opt out option, and the agreement is not procedurally conscionable. *See Mohamed*, 848 F.3d at 1211.

Rubio argues that *Gentry v. Superior Court*, 42 Cal. 4th 443, 470 (2007), confirms that preemployment arbitration agreements are adhesive and retain some procedural unconscionability where, notwithstanding a valid opt-out provision, the failure to opt out was not an "authentic choice." But, as addressed above, Rubio had a meaningful opportunity to opt out and he did not do so. To the extent Rubio argues that, notwithstanding the meaningful opt-out option, the

11

arbitration agreement is nonetheless adhesive and thus procedurally unconscionable, this argument is foreclosed by Ninth Circuit precedent. *See Kilgore*, 718 F.3d at 1059 (arbitration clause not procedurally unconscionable where there was a meaningful opt out option); *Mohamed*, 848 F.3d at 1211 ("an arbitration agreement is not adhesive if there is an opportunity to opt out of it"); *Circuit City Stores*, 283 F.3d at 1199 (arbitration agreement was not contract of adhesion, and not procedurally unconscionable, because there was an opportunity to opt out of it).

Rubio's reliance on *Swain v. LaserAway Medical Group*, 270 Cal. Rptr. 3d 786 (Cal. Ct. App. 2020), is also unpersuasive. In *Swain*, the opt-out policy was buried among other forms and there was no explanation that the plaintiff had the right to opt out of the arbitration agreement. *Id.* at 795–96. In contrast, here the arbitration agreement was not hidden; it was a freestanding five-page document that Aaron's provided to Rubio in PDF format during the onboarding process. The arbitration agreement contained a bolded section setting out Rubio's opt-out rights and the 30-day deadline to do so, with instructions on how to opt out and a clickable link to the opt-out form. *See* Ex. L (Doc. 7-2 at 43). Contrary to Rubio's assertions, Aaron's onboarding process adequately informed him of both the arbitration agreement and the opportunity to opt out.

Nor does the arbitration agreement's incorporation by reference of the AAA Rules render it unconscionable. The California Supreme Court has noted that the incorporation by reference of the AAA Rules would warrant closer scrutiny if there were "terms that were 'artfully hidden' by the simple expedient of incorporating them by reference rather than including them in or attaching them to the arbitration agreement." *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1245-46 (2016). But Rubio does not make any such argument in this case. In *Baltazar*, the court found that incorporation by reference of the AAA Rules did not add any procedural unconscionability, where the plaintiff's challenge to the arbitration agreement did not concern any particular provision of the AAA Rules. *Id.* The Court noted that, in cases faulting the incorporation by reference of the AAA Rules, "the plaintiff's unconscionability claim depended in some manner on the arbitration rules in question." *Id.* at 1246. Here, as in *Baltazar*, Rubio does not identify any concern with a particular provision in the AAA Rules; he alleges only a general objection to the agreement's incorporation of those rules by reference. The incorporation

by reference of the AAA Rules, without more, does not amount to procedural unconscionability. *Id.*

As the arbitration agreement is not procedurally unconscionable, the Court need not address the issue of substantive unconscionability. *See Mohamed*, 848 F.3d at 1211 (finding that, where arbitration agreement is not procedurally unconscionable, court need not reach issue of substantive unconscionability).

## IV. CONCLUSION AND ORDER

Accordingly, for the reasons discussed:

1. Defendant's motion to compel arbitration (Doc. 7) is granted;
2. This action is stayed pending arbitration proceedings; and
3. Within fourteen (14) days of the issuance of the arbitrator's decision, the parties shall notify the court that arbitration proceedings have concluded.

IT IS SO ORDERED.

Dated:   November 27, 2024

UNITED STATES DISTRICT JUDGE

13